OCTOBER TERM, 1875.

In the Matter of the probate of the Will of GIDEON HUMPHREY, deceased.

1. A testator, ninety-four years of age at the time of executing a codicil to his will, and retaining, to a remarkable degree, his mental faculties and his characteristics of firmness, independence and decision—*held*, to have been possessed of testamentary capacity.

2. Whether, in any case, there was undue influence exerted upon the testator, must be determined from the facts. It is not a presumption, but a conclusion.

In the matter of the will of Gideon Humphrey.

On appeal from the decree of the Orphans Court of Burlington county.

*Mr. F. Voorhees* and *Mr. J. Wilson*, for appellants.

*Mr. M. B. Taylor* and *Mr. William H. Browne*, (of Philadelphia,) for respondents.

THE ORDINARY.

Dr. Gideon Humphrey, then of Beverly, in the county of Burlington, made his will on the 28th of August, 1866. By it he directed that his debts and funeral expenses be paid, and that his real estate be sold by his executors. He gave to his son Henry certain articles by way of specific legacy ; and to his grandson, Gideon Moore, certain other articles, in like manner. He gave to Rachel Cavis, his housekeeper, $300, and certain articles of household furniture. To his daughter, Adelaide Josephine Hardcastle, he gave one of his portraits of himself, and household furniture not before disposed of. To his two grandsons, David Hays Humphrey and George M. Humphrey, he gave $300 each, to be paid to them respectively, on their attaining to the age of twenty-five years, with the interest accruing thereon from the time the money should come to the hands of his executors. If either of his said grandsons should die before attaining to that age, the survivor was to take his share ; and if both should die under that age, the legacies bequeathed to them were to be equally divided between the testator's two daughters, Eliza L. Moore and Adelaide J. Hardcastle. To his granddaughter, Kate Hardcastle, he gave $1000. The residue of his estate he directed to be equally divided between his two daughters above mentioned, to be held by them independent of the control of their respective husbands. In case of the death of either of his daughters, her children were to take her share. He states that he has not given much of his property to his son Henry, because of the latter's being possessed of a competency, and that Henry's sisters, therefore, had more need of the testator's

property than he had.  He appointed his friends, James Sterling and John C. Deacon, his executors.

On the 31st of January, 1867, he executed a codicil to the will, by which he revoked the gift to his daughter Adelaide, (who was then dead,) of the half of the residue of his estate, and gave the half given to her by the will, to her daughters, Kate Hardcastle, Belle Hardcastle, Adelaide Kedenburg, Lavinia Jenkins, and Anna Pennock, their heirs and assigns forever.

On the 2d of March, 1869, he executed another codicil, substituting his son Henry as executor, in place of Mr. Deacon.

On the 3d of June, 1872, he made another codicil, as follows :  " All that is contained in my said will relating to my daughter, Adelaide Josephine Hardcastle, and children, and also all that is contained in my first codicil thereto, dated January thirty-first, A. D. one thousand eight hundred and sixty-seven, relating to the same, I do hereby revoke and declare null and void.  After the payment of all my just debts and funeral expenses, and all the legacies mentioned in said will not hereby revoked, the residue of my estate, real, personal, or mixed, I bequeath to my daughter, Eliza L. Moore, for her use and disposal, in whatever manner she may think best.  The last item of my said will, appointing James Sterling and John C. Deacon my executors, I hereby revoke, and in their stead, nominate and appoint my only son, Henry M. Humphrey, of Stamford, in the State of Connecticut, my sole executor."

The controversy is in regard to this last or third codicil. The testator died on the 3d of August, 1872.  The will and codicils were admitted to probate by the surrogate of Burlington county, on the 21st of August, 1872.  Henry M. Humphrey, the executor named in the second and third codicils, having renounced the execution of the will and codicils, letters of administration *cum testamento annexo* were granted to Peter Powell on the last mentioned day.  The testator's estate in New Jersey was inventoried at $6871.90.  It appears by the final account of the administrator, filed in October, 1873, that

the entire estate (which was in three states—New Jersey, Connecticut, and Pennsylvania—) amounted to $17,097.25. The estate has been settled, and Mrs. Moore has received, pursuant to the provisions of the last codicil, the entire estate, after payment of debts and expenses of administration, except a balance of $671.26. Mrs. Jenkins, one of the daughters of Mrs. Adelaide J. Hardcastle, on the 23d of December, 1872, appealed to the Orphans Court of Burlington county from the order of the surrogate admitting the will and codicils to probate, and the grant of administration. The Orphans Court, by their decree made in September Term, 1874, admitted the will and the first two codicils to probate, and rejected the last codicil, and ordered that the taxable costs of the litigation before them be paid out of the estate, with a counsel fee of $1000 to the counsel on each side.

The last codicil was executed on the 3d of June, 1872, two months before the testator's death. It is insisted, on behalf of the appellant, in the Orphans Court, that the testator, at the time when that codicil was executed, was not possessed of testamentary capacity, and that it was the result of undue influence on the part of Mrs. Moore. Though the testator was a very old man, his age, at the time of his death, having been about ninety-four years, he appears to have retained to a remarkable degree, his mental faculties and characteristics, among which were firmness, independence and decision. He was blind.

Of his two daughters, Mrs. Hardcastle resided with him for the greater part of the time from the death of her husband, about the year 1859 or 1860, until her death, which occurred in or about the year 1867. She had six children, five of whom were daughters. Some of them the testator brought up. After the death of Mrs. Hardcastle, none of her children remained with him, except for short periods, except Kate, who had lived with him from the time when she was about three and a-half years old. She married in the early part of the fall of 1871, and left him and went to Europe to live. Her last visit to him was the last of August or first of Septem-

ber, in that year. From that time to the time when Mrs.
Moore came to live at his house, about Christmas, 1871, the
testator's family consisted of himself, Rachel Cavis his house-
keeper, and a colored boy. He appears to have often com-
plained that his nieces neglected him, and did not treat him with
due respect after their mother's death. Rachel Cavis says, that
" it hurt the doctor very much when Kate left him," and
that after Kate's visit he said, if she had staid with him till
his death, he would have left her $1000, but as she had left,
he was going to " make a change in his writings." She says,
he spoke about this several times, but did not say what
change he intended to make. C. B. Gregory, a witness pro-
duced by the appellant below, says he does not remember
hearing Dr. Humphrey refer to his granddaughters, the Hard-
castles, during the last six months of his life. This witness
was in the habit of visiting him once a week, unless prevented
by his own health or the weather. Except Kate, who lived
in Europe, none of these granddaughters lived farther off
than the city of New York, during the last year of the testa-
tor's life. They were all married. One of the daughters,
Mrs. Kedenburg, says that she visited the testator in Febru-
ary, 1872, about the 8th or 9th, and staid from three to five
days; that she thinks he was then enjoying his ordinary
health; that she left him physically well, and she is not posi-
tive, but thinks, he talked about matters in the same way he
usually did. After leaving him in February she did not see
him again until the following July; she thinks it was the
third week in July, and she then staid about three hours.
She says that she had not seen him for a year or two before
the visit in February. Mrs. Jenkins, the appellant below,
who resided in the city of New York, says that the last time
she saw the testator was in May, 1871, which was more than
a year before his death. Mrs. Pennock, another of Mrs.
Hardcastle's daughters, testifies that the last time she saw the
testator was in February, 1872—the same time Mrs. Keden-
burg visited him; that he was then in his usual health, both
of mind and body. She says she had remained at his house

In the matter of the will of Gideon Humphrey.

a short time, at different times; that she had spent several months there at a time, and that the last time she spent several months there, was in 1868. She did not know of his death until three weeks after it occurred. She was travelling in Canada at the time. Mrs. Parrish, another of Mrs. Hardcastle's daughters, who seems to have resided in Jersey City, testifies that the last time she saw the testator, was in July, 1871, about a year before his death. It appears, from the admissions of those of the granddaughters who have been sworn, that there were occasional disagreements, at least, between the testator and these granddaughters of his. Mrs. Jenkins says he was "rather a spunky old gentleman." Nor would there seem to be any excuse for this apparent neglect of the testator, in the alleged fact that these granddaughters were unable to hear from him in response to letters addressed to Mrs. Moore ; for his advanced age gave assurance of his continued and increasing infirmity ; his blindness made society and attention unspeakably more acceptable and valuable to him than it otherwise would have been, and naturally increased his sensitiveness to inattention on the part of his family. None of these granddaughters, except Kate, was at any considerable distance from him, and it seems not uncharitable to conclude, that if they had felt an interest in their grandfather's welfare, some of them, at least, would have visited him, the rather because, as they allege, they could get no tidings of him. That he felt the apparent neglect, keenly, there seems to be no room to doubt, and it appears that he was likely to remember such things in disposing of his property, for Mrs. Kedenburg says, that some time before his death, but when, she does not state, the testator, in speaking of her brother Jerome, to whom he gave nothing, said the latter had lost between $2000 and $3000, by the way he had acted.

Before Christmas, 1871, and before Mrs. Moore came to live with him, he sent for the scrivener, Mr. Powell. Rachel Cavis, the housekeeper, says, that the testator sent her for Powell before Christmas, and said he was going to " make a

change in his writings," and wanted to see Mr. Powell, and that she then went for Mr. Powell, but he could not come. She is corroborated in this by Mr. Powell. She testifies, also, that before the last codicil was written, the testator told her to send the colored boy for Mr. Powell. She did so. Mr. Powell says, that about the last of May or first of June, the colored boy came for him. Powell lived about four blocks distant from the testator's residence. He says that the boy did not tell him what the testator wanted to see him for; that he went the same day, and found the testator sitting up; that the testator told him he wished to make some change in the disposition of his property; that the testator told him he had sent for him in the winter, for the same purpose, but he had not come; that the testator sent for his will to be brought; that the housekeeper brought it; that no one was in the room; that the testator knocked for the housekeeper, and she came; that the testator told her what he wanted, and where she would find it; that she brought it, and retired; that after she retired, there was no one in the room but the testator and the witness; that the testator asked him to break the seal and open the will; that he did so, and read the will and the two codicils; that the testator then stated that he wished to make a change, in two or three particulars, in the original will; that one of the particulars was, he wished to revoke all that he had said in his will in regard to Adelaide Josephine Hardcastle and her children; that he gave no reason for it; that he said he wished to revoke the appointment of James Sterling as one of the executors, and appointed his son, Henry M. Humphrey, sole executor. He says he does not remember any other changes; that he noted them down; that he went home and wrote them off, as nearly as he understood it; that he took the will home with him, and on reading it over, suspected that he had not understood the testator about Kate Hardcastle's special legacy—the legacy of $1000 to her; that he wrote as he understood the matter, with the exception of that, and then went back for an explanation; that the testator said he intended to include all Mrs. Hard-

castle's children, and that the witness does not remember that he said anything else, except that he included that special legacy.

Powell further says, that on that visit, he took a draft of what he had prepared, and read it to the testator; that the draft left the $1000 stand valid; that the testator objected to that. He says there was no one in the room with them at this visit; that the testator was sitting up; that he then returned home and made another copy; that he drafted another codicil when he got home, and drafted it according to the testator's direction, and returned to him, he does not know whether on the same or the next day, and took the draft with him and read it to the testator, and he said it was right—it was what he wanted; and he says he then went home and copied it on the paper which was executed. He says there was no one in the room with them on that visit; that he returned the next day, by appointment, to have it executed; that the appointment was made when he read the last copy to the testator; that he does not remember that any arrangement was made as to the witnesses then; that when he returned at the time appointed, which was four o'clock in the afternoon, he was told, he thinks, by the testator, that they expected to have John Thomason and James D. Bennett as witnesses to the codicil; that he does not remember that the testator said he had sent for them, but he did send for them; that he sent a colored boy; that they did not come; that the boy brought word that they were not at home; that the testator then sent the same boy for Ezra C. Tompkins and Mr. Pritchett, the latter of whom was a stranger to the witness; that, on that visit, and before the witnesses came, he read the codicil to the testator; that the testator and he had no talk about it, further than to ascertain that it was the testator's mind, and that the testator said it was what he wanted. The witness details the formalities of the execution, from which it appears that the codicil was duly executed. He testifies that the testator was "decidedly" of sound and disposing mind, memory, and understanding when the codicil was executed. The witnesses both testify that they

considered the testator of sound mind.    One of them, Tomp-
kins, appears to have been intimately acquainted with him.
He says he knew him for three years before his death ; that
he considered him, at the execution of the codicil, of sound
mind, and that he could see no difference in him then from
what he was when he was first acquainted with him.    His
action and conversation in regard to the last codicil, were in
accordance with the firmness and persistency which marked
his character.    The testamentary capacity of the testator, at
the time of making the third codicil, is established.

The charge that the codicil was the result of undue influ-
ence on the part of Mrs. Moore, seems to be wholly unsup-
ported.    She does not appear to have done or said anything
to induce the testator to make that codicil.    She spoke re-
proachfully in his presence, of the fact that the daughters of
Mrs. Hardcastle paid so little attention to him.    It appears,
also, that she and the testator both complained of like inat-
tention on the part of the Gregorys, who lived in Beverly.
This is, according to the evidence, the extent of her influence.
Such expressions are not enough to justify the conclusion that
the codicil was the result of undue influence.    She neither
had the will, nor interested herself, as far as appears, in any
alteration of it.    The will was kept by the housekeeper, who,
in taking charge of it and producing it, acted under the direc-
tions of the testator himself.

It is said there was a feud between Mrs. Moore and her
nieces.    The evidence shows only that she spoke reproachfully
of them in regard to their neglect of their grandfather, and,
according to one witness, spoke of them as liars—not, how-
ever, in the testator's presence.

Whether, in any given case, there was undue influence,
must be determined from the facts.    It is not a presumption,
but a conclusion.    Mrs. Moore may have disliked her nieces;
she may have spoken reproachfully of them for neglecting to
visit their grandfather ; she may have said to the witness re-
ferred to, that they were liars.    She, indeed, lived in the same
house with the testator, and was in daily and nightly attend-

ance upon him, and the codicil is wholly in her favor.   Notwithstanding all these things, the testator's mind may have been, and, for aught that appears, it was, wholly free to dispose of his property as he pleased.

The testator seems, at no time, to have contemplated an equal division of his property, even among his children.   His will, which no attempt is made to impeach, gives nothing of consequence to his son Henry ; and to the sons of his son Washington, it gives only $300 apiece.   By the first codicil he gave the half of the residue he had given to his daughter Adelaide, to her daughters alone—giving nothing to her son. A discrimination made by a man of the testator's age, and in his condition, in disposing of his estate by will, in favor of his only daughter, (who, in this case, may be presumed to have been advanced in years,) who has given him her whole time, and with assiduous attention ministered to his wants when he most needed care and sympathy, can neither be regarded as evidence of incapacity or of undue influence. Especially is this so when the discrimination is in her favor, against granddaughters, who, having been brought up by him, in his family, have married and left him.   There is evidence that the testator considered, also, that he had done his full duty towards these granddaughters, without leaving them any portion of his estate ; for, in his conversation with the scrivener, in regard to the last codicil, he said that, if it had not been for his grandchildren, he might have had something worth leaving.

The decree of the Orphans Court will, so far as the third codicil is concerned, be reversed.   Complaint is made of the allowance made by that court for counsel fees, $1000 to the counsel of each side.   The taking of the testimony occupied five days only.   Under the circumstances, the amount awarded is excessive.   The decree will be reversed in that respect, also.   A counsel fee of $300 will be allowed to the counsel of the appellants, and the like sum to the counsel of the respondents, in the Orphans Court.   A like counsel fee will be ordered to be paid out of the estate to the counsel of the appellants and respondents respectively, in this court.